# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 30, 2014 Session

## IN RE ALEXUS F.

**Appeal from the Juvenile Court for Hamilton County**
**No. 258046     Robert D. Philyaw, Judge**

---

**No. E2014-00723-COA-R3-PT-FILED-NOVEMBER 13, 2014**

---

This is a termination of parental rights case filed by the Tennessee Department of Children's Services. The trial court found that clear and convincing evidence existed to terminate Father/Appellant's parental rights on the grounds of abandonment and substantial noncompliance with the requirements outlined in the permanency plans. The trial court also found, by clear and convincing evidence, that termination of the Father's parental rights was in the child's best interest. Father appeals. We affirm the termination of Father's parental rights on the sole ground of substantial noncompliance with the permanency plan. Affirmed and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

David Christopher Veazey, Chattanooga, Tennessee, for the appellant, Jonathan F.

Robert E. Cooper, Jr., Attorney General and Reporter; Alexander S. Rieger, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

Patricia C. Basham, Chattanooga, Tennessee, Guardian Ad Litem.

## OPINION

## I. BACKGROUND

The minor child, Alexus F.,[1] was born in March of 2012. On April 23, 2012, the Tennessee Department of Children's Services (the "Department," or "Appellee") removed the child from mother's custody.[2] The following day, the Department filed a petition for temporary custody in the Juvenile Court of Hamilton County. In its petition, the Department alleged that at the time of Alexus' birth, she and her mother tested positive for benzodiazepines due to mother's alleged use of un-prescribed medication during the pregnancy. Because of the severity of Alexus' withdrawal symptoms, she was transferred to a children's hospital, where she remained in the Neonatal Intensive Care Unit for approximately one month. Alexus was also born with microcephaly, a rare neurological condition that causes the infant's head to be significantly undersized such that it may restrict the size of the brain. In addition, Alexus was born without a fontanel ("soft spot") on her head. Alexus will require surgery in the future to separate the bones in her skull in order to create space for her brain to grow. Alexus will likely have developmental delays due to her condition at birth.

At the time of Alexus' removal from her mother's care, placement with the father, Jonathan F. ("Father," or "Appellant"), was not a suitable alternative due to his history of repeated incarcerations. When Alexus was placed in state custody, Father was living with his mother, but had been in and out of jail for approximately one year. Mother and Father have five other children, none of whom are in their custody.

On April 24, 2012, the trial court entered a protective custody order, finding probable cause to believe that Alexus was dependent and neglected. The court placed Alexus in the temporary custody of the Department, where she has remained since the initial placement. Both parents waived their right to a preliminary hearing, and the child remained in the Department's custody.

On May 2, 2012, the Department developed the first permanency plan in this case. Neither parent participated in the creation of this initial plan. Pursuant to the plan, Father's

---

[1] In termination of parental rights cases, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities. At various points in the record, the spelling of Alexus' name differs from "Alexus" to "Alexis". For purposes of consistency, we will use the "Alexus" spelling in this opinion.

[2] According to the trial court's termination of parental rights order, at some point during these proceedings, Mother "surrendered her parental rights." Mother is not a party to this appeal.

requirements were as follows: (1) complete an alcohol and drug assessment and follow all recommendations; (2) submit to random drug screens; (3) not use, sell, or manufacture drugs or associate with those who do; (4) not show up for visitation under the influence of drugs or alcohol; (5) learn to cope with the stressors of life without the use of and dependence on illegal drugs; and (6) seek mental health assistance and take all medication as prescribed. Additionally, the plan required Father to: (1) pay child support as ordered; (2) obtain and maintain safe, stable housing; (3) sign all release of information forms; (4) resolve all legal issues; (5) abide by the rules of his probation; (6) resolve all domestic violence issues; (7) enhance his parenting skills; (8) keep in contact with the Department; (9) show proof of income; (10) adhere to his visitation schedule; and (11) comply with all service providers. To assist Father in meeting the foregoing requirements, the Department was to "monitor, administer, or make proper referral to [an alcohol and drug treatment] provider." The Department also scheduled supervised visitation for Father at the Department offices on Tuesdays at 2:00 p.m., starting on May 15, 2012. To facilitate the visitation, the Department provided Father with bus passes. This initial plan was ratified by the trial court on August 12, 2012, upon its finding that the requirements outlined in the plan were "reasonably related to remedying the reasons necessitating foster care placement."

On December 6, 2012, the trial court held an adjudicatory hearing on the Department's dependency and neglect petition. By order of January 3, 2013, the trial court found, by clear and convincing evidence, that Alexus was dependent and neglected. In its order, the court noted that Father "remains incarcerated and cannot provide a stable environment for [the] child." The court further found that Father "has not visited with [the] child since June 2012." Accordingly, the court ordered that temporary custody remain with the Department.

The trial court held a permanency hearing on April 18, 2013. By order of June 27, 2013, and based upon the Department's affidavit detailing its reasonable efforts to assist the Father, the trial court found that Alexus' continued placement in foster care was appropriate, and that she was receiving medical care for her various health issues. In addition, the trial court found that the Department had provided the following services to Father: (1) mental health assessment; (2) basic parenting instruction; (3) bus passes or other transportation; and (4) visitation. Although the Department provided these services, the court found that Father "is not in substantial compliance [with the permanency plan] in that he has not visited with said child since June 2012, and has been repeatedly incarcerated." Moreover, the court noted that Father had "not completed any tasks on the permanency plan" and had "not maintained contact with the Department. . . ."

The second permanency plan was created on August 15, 2013. In this plan, the Department noted that the "[c]hild has been in state custody for over a year and [the] parents have not visited and [have] been absent since [the child came into protective custody]." The goals

3

developed for Father in the second plan were similar to those outlined in the initial plan. He was required to: (1) complete alcohol and drug assessment and to follow all recommendations; (2) submit to random drug tests; (3) not sell, use, or manufacture drugs or to associate with those who do; (4) not show up for visitation under the influence; (5) resolve all current legal issues; (6) not pick up additional charges, and otherwise cooperate with the requirements of his probation; (7) protect the child from hurt, harm and danger; (8) not engage in domestic violence; and (9) participate in domestic violence and parenting classes. In addition, the second plan required Father to: (1) pay child support; (2) maintain safe and stable housing; (3) enhance his parenting skills; (4) obtain a mental health assessment and take all medications as prescribed; (5) keep in contact with the Department; and (7) attend Child and Family Team meetings and all court hearings. The Department noted in the second plan that Father "lives with his mother when [he is] not incarcerated," and "continues to pick up legal charges and is now jailed. . . [and is] awaiting trial." Furthermore, the plan noted that Father had paid no child support, "ha[d] provided [no] proof of stable income or housing," and had "not been in contact with [the Department]." Unlike the initial plan, Father participated in the creation of the second plan and signed the plan on September 24, 2013. By order of November 21, 2013, the trial court ratified the second plan, finding that the plan requirements were "reasonably related to remedying the reasons necessitating foster care placement," and that the "Department is making reasonable efforts toward the goal of reunification. . . ."

After Alexus had been in the Department's custody for over eighteen months, on November 5, 2013, the Department filed a petition to terminate Father's parental rights. As grounds for its petition, the Department alleged: (1) abandonment, under Tennessee Code Annotated Section 36-1-113(g)(1), by willful failure to visit, willful failure to provide support, and failure to provide a suitable home; and (2) substantial noncompliance with the permanency plan pursuant to Tennessee Code Annotated Section 36-1-113(g)(2). The Department further alleged, in its petition, that termination of Father's parental rights was in the child's best interest.

On December 20, 2013, the trial court appointed a lawyer to represent Father in this case. By separate order entered on the same date, the trial court appointed a guardian ad litem to represent the child. The Department's termination petition was heard by the trial court on February 14, 2014. By order of March 18, 2014, the trial court terminated Father's parental rights on the grounds of abandonment and failure to substantially comply with the requirements of the permanency plans. The trial court likewise found, by clear and convincing evidence, that termination of Father's parental rights was in the child's best interest.

4

## II. ISSUES

Father appeals. He raises four issues for review as stated in his brief:

> 1. Whether the trial court erred in finding clear and convincing evidence for the ground of abandonment.[3]
> 2. Whether the trial court erred in finding clear and convincing evidence for the ground of substantial noncompliance with the statement of responsibilities of the permanency plan.
> 3. Whether the trial court erred in finding clear and convincing evidence that terminating the Respondent's parental rights was in the best interest[] of the child[].
> 4. Whether the trial court abused its discretion in admitting testimony as evidence that the Respondent had a pending charge of attempted murder.

## III. ADMISSION OF EVIDENCE

Before addressing the termination of Father's parental rights, we first address Father's issue concerning the admission of evidence regarding his pending charge for attempted murder. Tennessee Rule of Evidence 404(b) provides:

---

[3] Tennessee Code Annotated Section 36-1-102(1)(A)(iv) defines "abandonment," for purposes of termination of parental rights, in relevant part, as follows:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child

At oral argument before this Court, the Department conceded that the ground of abandonment was not met in this case largely due to the fact that there is not a clear four-month period prior to Father's incarceration to examine. Accordingly, we will not consider abandonment as a proper ground for termination of Father's parental rights, but will address only the ground of substantial noncompliance with the permanency plan.

(b) Other Crimes, Wrongs, or Acts.  Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Father contends that his arrest and pending charge for attempted first degree murder was improperly considered by the trial court.  At the February 14, 2014 hearing Father was questioned, in relevant part, as follows:

Q.  And you are incarcerated right now; is that correct?

A.  Yes

Q.  And you are facing murder charges?

[FATHER'S LAWYER]: Objection, Your Honor.  He's not been convicted on these charges.  That's not admissible.

[DEPARTMENT'S LAWYER]: I didn't ask him that.

THE COURT: Overruled.

Q.  Why are you presently incarcerated?

A.  I've been charged with attempted first degree murder, which it's out of self-defense.

6

THE COURT: The objection is sustained to the extent that you don't need to talk about that.  It was just a question about why you were in jail.

Q.  I had no intention of going into it.

THE COURT: I knew you didn't, but I wanted to stop him before he started talking.

Q.  How long have you been [in] jail?

A.  Almost a year.

It is well settled that issues concerning the admission of evidence rest within the sound discretion of the trial court and will only be overturned on appeal when the trial court abuses its discretion. ***Otis. v. Cambridge Mut. Fire Ins. Co.***, 850 S.W.2d 439, 442 (Tenn.1992). An abuse of discretion occurs only when the trial court "applies an incorrect legal standard or reaches a decision that is without logic or reasoning, and the result of that decision prejudices the complaining party." ***State v. Shirley***, 6 S.W.3d 243, 247 (Tenn.1999) (citing ***State v. Shuck***, 953 S.W.2d 662, 669 (Tenn.1997)).

Here, the trial court sustained Father's objection, thus limiting the evidence of Father's incarceration to cover only the fact of his incarceration, and not the nature of the charge against him that led to the incarceration.  By sustaining the objection, the trial court negated the need for a Rule 404 hearing on the evidence.  Father, however, argues that the trial court nonetheless considered the nature of his pending charge in reaching its decision to terminate his parental rights.  We respectfully disagree.  In the first instance, the trial court specifically stated from the bench, during its oral ruling on the objection, that "the nature and type of charges isn't really a part of the Court's consideration. . . ."  We note that in its order, the trial court states that Father "is currently incarcerated with pending charges, one of which is attempted murder;" however, the mere reference to the attempted murder charge does not, *ipso facto*, support Father's contention that the nature of the pending charge influenced the court's decision to terminate his parental rights.  Indeed, there is nothing in the record from which we may infer or conclude that the type of charge had any bearing on the court's decision.  Rather, reading the court's order in its entirety, and considering the court's oral ruling on the objection, it is clear that Father's incarceration itself is what influenced the trial court's decision to terminate his parental rights, not the nature of the offense that led to the incarceration.  Because there is insufficient evidence in the record to support Father's

contention that the trial court based its decision on the nature of Father's alleged crime, and because the trial court properly sustained Father's objection, we hold that the trial court did not abuse its discretion.

## IV. STANDARD OF REVIEW FOR TERMINATION OF PARENTAL RIGHTS

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App.2003) (quoting Tenn. Code Ann. § 36-1-113(i)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest [ ] of the child.

Tenn. Code Ann. § 36–1–113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds* by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W .3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn.

Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. ***State v. Demarr***, No. M2002–02603–COA–R3–JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. ***In re Valentine***, 79 S.W.3d at 546; ***In re S.M.***, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); ***In re J.J.C.***, 148 S.W.3d 919, 925 (Tenn. Ct. App.2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. ***In re A.D.A.***, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); ***Ray v. Ray***, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); ***In re C.W.W.***, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this Court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See **In re Adoption of A.M.H.***, 215 S.W.3d [793,] 809 [ (Tenn.2007) ]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. ***State Dep't of Children's Servs. v. Mims***, 285 S.W.3d [435,] 447-48 [ (Tenn. Ct. App. 2008) ]; ***In re Giorgianna H.***, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); ***In re S.M.***, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App.2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. ***In re Angela E.***, 303 S.W.3d [240,] 246 [ (Tenn.2010) ]; ***In re Adoption of A.M.H.***, 215 S.W.3d at 809.

***In re Bernard T.***, 319 S.W.3d 586, 596–97 (Tenn.2010).

## V.  DISCUSSION

### A. Substantial Non-Compliance with the Permanency Plan

Father's parental rights were terminated on the ground of failure to substantially comply with his responsibilities as set out in the permanency plan. Tenn. Code Ann. § 36-1-113(g)(2). As discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.*, 2003 WL 21266854, at \*12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548.

*Id*. at 656–57.

In pertinent part, Father's responsibilities under the August 15, 2013 permanency plan included: (1) complete alcohol and drug assessment and to follow all recommendations; (2) submit to random drug tests; (3) not sell, use, or manufacture drugs or to associate with those who do; (4) not show up for visitation under the influence; (5) resolve all current legal issues; (6) not pick up additional charges, and otherwise cooperate with the requirements of his probation; (7) protect the child from hurt, harm and danger; (8) not partake in domestic violence; (9) participate in domestic violence and parenting classes. In addition, Father was required to: (1) pay child support; (2) maintain safe and stable housing; (3) enhance his parenting skills; (4) obtain a mental health assessment and take all medications as prescribed; (5) keep in contact with the Department; and (6) attend Child and Family Team meetings and all court hearings.

As noted above, the trial court specifically found that the foregoing requirements were

reasonable and related to remedying the conditions that caused the child to be removed from the Father's custody in the first place. ***In re Valentine***, 79 S.W.3d at 547. Father does not challenge the trial court's finding that the requirements of the permanency plans were reasonable and related to remedying the conditions that led to the removal of the child.

Concerning Father's failure to substantially comply with the plan, the trial court's March 18, 2014 order states, in relevant part, as follows:

> [Father] has failed to comply in a substantial manner with the statement of responsibilities set out in periodic foster care plans prepared for and signed by said Respondent, following the subject child being found to be dependent and neglected. . . . Children's Services has explained to Respondent those reasonable responsibilities, which are directly related and aimed at remedying the conditions, which necessitate foster care placement.
>
> Specifically, Respondent. . . failed to[:] pay child support as ordered by the State of Tennessee; obtain and maintain safe, stable housing; sign all release of information forms; resolve all legal issues; abide by the rules of [his] probation; resolve domestic violence issues; enhance parenting skills; keep in contact with DCS; provide DCS with legal, verifiable means of income, adhere to visitation schedule; and comply with all service providers. None of these responsibilities were completed.

Turning to the record, Father's own testimony clearly and convincingly supports the trial court's finding that he did not substantially comply with the requirements of the permanency plan:

> Q. And you [Father] signed the plan. Do you remember that?
>
> A. Yes.
>
> Q. You signed the statement of responsibility, so you knew what you had to do?
>
> A. Yes.
>
> Q. Tell me, what were you supposed to do on that plan?

11

A. I was supposed to get a psych assessment.

*                              *                              *

Q. Did you do that?

*                              *                              *

A. No.

Q. You haven't done that?

A. No, I never did.

Q. What else were you supposed to do on your plan?

A. Have a steady home and place to live.

Q. Did you ever have that?

A. No.

Q. What else were you supposed to do on your plan?

A. And a drug and alcohol program.

Q. Did you do that?

*                              *                              *

A. No, I haven't done it.

Q. Did your plan ask you to resolve all your legal issues and keep yourself out of jail?

A. Yes.

Q. Obviously you weren't able to do that?

A. No.

12

Ms. Nerva Ashay, the case worker assigned to Alexus's case by the Department, testified that Father had not substantially complied with his requirements under the permanency plan. Specifically, she testified that Father had not: (1) submitted to a psychological assessment; (2) submitted to drug and alcohol assessment; (3) provided proof of stable housing; or (4) shown proof of employment or income.

As set out in the permanency plan, which he signed, Father was required to participate in visitation with the child. Ms. Ashay's testimony clearly indicates that Father did not do so:

> Q [to Ms. Ashay]. Did he ever ask to set up visitation with Alexus?
>
> A. We [i.e., the Department] set up plenty of visitation for him. He just didn't show up.
>
> *                          *                          *
>
> Q. When he wouldn't show up, what would you do? Would you try to call him?
>
> A. Yeah, I called him. He said, oh, I forgot or I didn't have a ride, I didn't have gas. I have offered to bring the child halfway. He just didn't do it.

Father was also required to pay child support under the plan. We acknowledge that, during most of these proceedings, Father has been incarcerated and, therefore, unable to work. However, Father testified that he had employment during periods of time when he was not in jail:

> Q. And prior to going to jail, were you working?
>
> A. Yes. I was working with my uncle doing sheetrock, drywall.
>
> Q. How much money were you making prior to your incarceration?
>
> A. It varies.

Father stated that during those times he was employed, he would give money to his mother to help her care for another of his children; however, there is no evidence in the record that

he ever paid any of his earnings toward Alexus' care.

From the evidence in the record, and particularly in light of Father's own testimony, which was corroborated by Ms. Ashay, we conclude that the trial court's finding that Father was not in substantial compliance with the permanency plan is supported by clear and convincing evidence.

## B. Reasonable Efforts

The decision to pursue termination of parental rights on the ground of substantial noncompliance with a permanency plan usually invokes the Department's statutory duty to make reasonable efforts to facilitate the safe return of the child to the parent's home. *In re R.L.F.*, 278 S.W.3d 305, 315 (Tenn. Ct. App. 2008) (citing Tenn. Code Ann. § 37-1-166(b), −166(a)(2), −166(g)(2)); *see also In re Tiffany B.*, 228 S.W.3d 148, 160 (Tenn. Ct. App. 2007) (vacating a finding of abandonment, substantial noncompliance, and persistence of conditions for failure to make reasonable efforts). The statutory duty to make reasonable efforts includes an obligation to exercise "'reasonable care and diligence. . . to provide services related to meeting the needs of the child and the family.'" *In re R.L.F.*, 278 S.W.3d at 316 (emphasis omitted) (citing Tenn. Code Ann. § 37-1-166(g)(1)). Courts evaluate the reasonableness of the Department's efforts in consideration of the following factors:

> (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Tiffany B.*, 228 S.W.3d at 158–59 (footnote omitted) (citing *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006)). Courts should decide the reasonableness of the Department's efforts "on a case-by-case basis in light of the unique facts of the case." *In re Bernard T.*, 319 S.W.3d 586, 601 (Tenn. 2010) (citing *In re J.C.D.*, 254 S.W.3d 432, 446 (Tenn. Ct. App. 2007)). The burden is on the Department to prove, by clear and convincing evidence, the reasonableness of its efforts. *In re R.L.F.*, 278 S.W.3d at 316 (citing *In re B.B.*, No. M2003–01234–COA–R3–PT, 2004 WL 1283983, at *9 (Tenn. Ct. App. June 9, 2004)).

14

The exercise of reasonable efforts is important because "[t]he success of a parent's remedial efforts generally depends on the Department's assistance and support." *In re Giorgianna H.*, 205 S.W.3d at 518 (citations omitted). Department employees must affirmatively and reasonably use their education and training to help a parent eliminate the conditions requiring removal of the children and to meet the responsibilities of the permanency plans before courts will terminate the parent-child relationship. *In re R.L.F.*, 278 S.W.3d at 316. The Department's duty to affirmatively assist parents exists even if the parents do not seek assistance. *Id.* (citing *In re C.M.M.*, No. M2003–01122–COA–R3–PT, 2004 WL 438326, at *7 (Tenn. Ct. App. March 9, 2004)).

The Legislature, however, did not place the burden to reunify parent and child on the Department's shoulders alone. *See State, Dep't. of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008). Reunification "is a two-way street, and neither law nor policy requires the Department to accomplish reunification on its own without the assistance of the parents." *In re Tiffany B.*, 228 S.W.3d at 159 (citations omitted). "Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody." *Id*. Once services have been made available, parents must make reasonable efforts to rehabilitate themselves. *Id*.

Here, the trial court made an express finding that the Department made reasonable efforts to assist Father. From our review of the record, we agree. Despite Father's incarceration during most of these proceedings, Father testified that Ms. Ashay had "offer[ed] [Father] information and help when [he] was out of jail. . . so [he] would know what to do to attempt to get custody of [his] daughter." Ms. Ashay testified, in relevant part, that:

> Q. How often did you attempt to contact [Father]?
>
> A. Almost every month I usually tried to reach out to him. Sometimes more than a month depending on if the child has an appointment that I wanted him to come to. He said he wanted to parent. I wanted him to go to doctors' appointments. I have attempted home visits. He forgot that I was coming. I have sent him letters.

As previously discussed, Ms. Ashay also testified that she set up numerous visits for Father, but he failed to show up. In his testimony, Father admitted he had not seen Alexus since shortly after her birth. Furthermore, because Father stays with his mother when he is out of jail, Ms. Ashay testified she tried to arrange a home visit at the grandmother's house. However, when Ms. Ashay was on her way to the grandmother's house for the visit, and called Father to confirm, he said "I didn't remember you were coming."

Despite Father's frequent incarceration, the Department provided him with referrals for programs and classes he was required to attend under the plan, and with transportation. Father, however, failed to avail himself of the reasonable services provided by the Department in its effort to reunite him with his daughter. We acknowledge Father's testimony that he completed a parenting class in jail. However, he failed to complete the most important requirements of the plan, which were to resolve his legal issues and to stay out of jail. From our review of the record, we conclude, as found by the trial court, that the Department made reasonable efforts to assist Father in completing his requirements under the permanency plan.

## C. Best Interest

"The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interest." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Accordingly, before a court in this State can terminate a biological parent's parental rights, it must find that doing so is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2). In determining whether termination of parental rights is in a child's best interest, the trial court must consider the following factors:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with

16

the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101. Tenn. Code Ann. § 36–1–113(I).

The foregoing list of factors is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *State Dept. of Children's Services v. Hood*, 338 S.W.3d 917, 929 (Tenn. Ct. App. 2009) (citing *State v. T.S.W.*, No. M2001–01735–COA–R3–JV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002)).

In its March 18, 2014 order, the trial court made the following findings concerning Alexus's best interest:

(a) . . . [Father] has not visited with the child since approximately June of 2012. His last contact with the Department was August 2012.
(b) [Father] failed to make any adjustment of circumstance, conduct or conditions to make it safe and in the child's best interest to be placed in [his] care. [Father] is currently incarcerated with pending charges, one of which is attempted murder.
(c) [Father] failed to make a lasting correction of his circumstances after the State has tried to help him for such a

17

time that it doesn't appear that lasting change is likely. [Father] is currently incarcerated with pending charges, one of which is attempted murder.

(d) [Father] has not maintained regular visitation or other contact with the child. [Father's] last visit with the [] child was in June 2012.

(e) There is no meaningful relationship between [Father] and child. The only reliable parent the child has known is the foster mother.

(f) A change of caretakers and home is likely to have a highly negative effect on the child. The child is placed in a stable and loving home and has bonded with the foster parent. The foster parent wants to adopt said child. The foster parent is the only parent the child has know.

As noted above, the record clearly establishes that Father has not visited Alexus since June of 2012. Thus, no meaningful relationship exists between the child and Father. Indeed, the child's foster mother testified that Alexus refers to the foster mother and her husband as "Mommy" and "Daddy."

Additionally, the fact that Father was incarcerated at the time of the trial also shows that he has failed to make an adjustment of circumstances to enable him to parent this child. Father testified that: "I want to be a father to Alexus. It's just I keep–something always keeps going on, you know. Something always happens." Father could not, however, testify as to what specific steps he had made, or would make, in order to ensure that he will stay out of jail so as to be able to care for Alexus. Indeed, Father stated that it would "take at least another year from the day [he gets out of jail] before [he] will be in a position to take care of the child." It further appears that Father takes no responsibility for his part in the current situation and the possible termination of his parental rights. Rather, he testified:

> [M]y wife [the child's mother] has caused all this to happen. The State wouldn't be involved if she was doing right. This wouldn't be going on right now. The whole reason this is going on is because she was doing all that. . . .

Mother's actions, of course, led to the initial removal of the child. However, Father's failure to change his own circumstances is the reason he cannot parent Alexus. His statement that the entire situation stems from the mother's actions, and the fact that he has not taken any responsibility for his own parental shortcomings, does not support a finding that Father will remedy his behavior or living conditions at any early date so as to obtain custody of Alexus.

18

Meanwhile, since coming into foster care, Alexus has flourished. As discussed earlier, Alexus was born with serious medical conditions. Ms. Ashay testified that the foster parents have been diligent in making sure Alexus attends all of her doctors' appointments and receives all of the medical care she needs. As a result, despite the many medical issues that were present at birth, Alexus is currently doing well and is only approximately two-months behind in her development.

The record establishes that Alexus has a strong bond with her foster family, and they with her. In fact, the foster parents have expressed a desire to adopt Alexus. In any event, it is clear that Alexus is receiving proper care with the foster parents, and that she is in a stable home environment. Removing Alexus from the foster placement at this time would very likely have a negative effect on her. Moreover, at no time since Alexus' birth has Father shown an ability or desire to provide Alexus with a safe and stable home. As such, numerous questions remain as to whether Father will ever provide a proper home for this child. In view of the relevant statutory factors, we conclude that there is clear and convincing evidence in the record to support the trial court's finding that termination of Father's parental rights is in Alexus' best interest.

## VI. CONCLUSION

For the foregoing reasons, we affirm the order of the trial court terminating Father's parental rights on the ground of substantial non-compliance with the permanency plan. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellant, Jonathan F. Because Father is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
KENNY   ARMSTRONG,   JUDGE